STEAMSHIP RUTHERGLEN CO., Limited, v. HOWARD HOULDER & PARTNERS, Inc.

HOWARD HOULDER & PARTNERS, Inc., v. STEAMSHIP RUTHERGLEN CO., Limited.

(District Court, S. D. New York. October 18, 1910.)

1. SHIPPING (§ 39*)—CHARTER—CONSTRUCTION—GUARANTEED CAPACITY OF VESSEL.

A guaranty in a charter party made in New York for an English ship, which was to receive a lump sum for the voyage, that her dead weight capacity was "6,100 tons of 20 cwt.," construed, on evidence that such was the English custom, to mean long tons of 2,240 pounds, and the charterer *held* entitled to an allowance because of her failure to load such quantity, which was tendered.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

2. SHIPPING (§ 177*)—DEMURRAGE—CESSER CLAUSE IN CHARTER.

Under a charter party which required the charterer to provide lighters if necessary to enable the steamer to go alongside any safe dock, and by which a lump sum as freight was to be paid for the voyage, the vessel was entitled to demurrage for the time she was delayed before she could get a berth where she could lie for discharging where she could have discharged at once if a portion of her cargo had been lightered, notwithstanding a cesser clause that "charterers' liability to cease on cargo being shipped and freight paid" and the payment of freight before discharge.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–582, 584; Dec. Dig. § 177.*]

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

---

3. SHIPPING (§ 39*)—CHARTERS—CESSER CLAUSE.

If a charter party contains an agreement between the owner and charterer which cannot be performed, and cannot even be entered upon when the cargo is shipped, or when bills of lading are signed at the loading ports, the charter must continue in existence until that portion of the contract relating to some other place and to a future time is completed, notwithstanding an apparently conflicting provision of the cesser clause.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

4. SHIPPING (§ 39*)—CHARTERS—AGENCY FEES.

A provision of a charter party that the steamer was to be consigned to charterer's agents at port of loading and discharging "on usual terms, say £10. 10s at each port" amounted to an agreement by the charterer that the agency fees should not exceed such sum and rendered it liable for the excess where a substantially larger fee was charged by its agents.

[Ed. Note.—For other cases. see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

In Admiralty. Suit by the Steamship Rutherglen Company, Limited, against Howard Houlder and Partners, Incorporated, with cross-libel. Decree for libelant.

Convers & Kirlin (John M. Woolsey, of counsel), for Rutherglen.

Wheeler, Cortis & Haight (Charles S. Haight and John W. Griffin, of counsel), for Howard Houlder & Partners.

HOLT, District Judge. These are a libel and cross-libel filed to recover claims arising out of a shipment of a cargo of railroad iron on the steamship Rutherglen on a voyage from New York to Dalny, Manchuria, and thence to Takow, Formosa. The original libel was filed by the owner of the Rutherglen against Howard Houlder & Partners, Inc., the charterers of the steamer, to recover upon three claims: (1) A claim for an unpaid balance of the lump sum chartered freight of £277.7.7, amounting in United States currency to $1,349.86. (2) A claim for 15½ days' demurrage while awaiting discharge at Dalny, at the rate of £45.14 per day, making a total of £708.7, or, in United States currency, $3,447.17. (3) A claim for an excess agency fee charged to the steamship by the agents designated by the charterers at Takow in the sum of £14.10, or $70.56. The cross-libel is to recover damages because the steamer was not loaded to her full capacity. It alleges that the steamer when she sailed had 13,112 empty cubic feet of space, which would have stowed 325 tons of cargo, and that the charterers were damaged by the steamer's refusal to take said additional cargo in the sum of £466.17.6, making £169.9.11 due, in addition to the sum of £277.7.7, withheld by the charterers from the lump sum freight.

[1] 1. The charter party was made in New York. It guaranteed the steamer's dead weight capacity at "6,100 tons of 20 cwt." A ton of 20 cwt. in this country usually means a short ton of 2,000 pounds. But this was a charter party of an English vessel, and there is evi-

dence in the case that the generally understood meaning of the term "ton" as used in charter parties is a long ton; that is to say, that the term "cwt." means a weight of 112 pounds, the usual meaning of the term in England, instead of 100 pounds. It does not appear to be contradicted by the counsel for the Rutherglen that that is the correct meaning of the phrase, and I shall assume that the charter party guaranteed that the steamer had a dead weight capacity of 6,100 tons of 2,240 pounds each. The evidence in my opinion shows that the actual weight of the cargo carried was 13,173,389 pounds, amounting to 5,880.97 long tons. With this amount of cargo the ship was overloaded, and in my opinion, upon the evidence, the ship could not carry 6,100 long tons, and the owner is liable under the guaranty that she could carry that amount. The price to be paid for the steamer as fixed in the charter was the lump sum of £9,400. The evidence in the case is not sufficiently clear and specific to enable me to pass satisfactorily on the question what amount of deduction should be made from the lump sum freight in view of the claim made in the cross-libel of the respondents. A reference will be directed upon that point.

[2] 2. The second claim in the libel is to recover $3,447.17 for 15½ days' demurrage at Dalny. The steamer, when she arrived at Dalny, could not get a berth where she could lie without discharging a part of her cargo, and was obliged to wait 15½ days before she could get such a berth at which to discharge. The charter party provided that the charterers were to provide lighters, if necessary, to enable the steamer to go alongside of any safe dock, wharf, or anchorage. There were vacant berths at Dalny where the steamer could have gone alongside and discharged, if about 500 tons of cargo had been removed upon lighters. It is claimed that no lighters could be obtained at Dalny. The evidence is that there were junks which could have been obtained. The respondent claims that they were fishing junks, unfit to be used for the discharge of heavy railroad iron, but the evidence is that there were large junks there which could have been obtained. It is also claimed that, if the iron had been discharged into any of these junks, it could not have been unloaded from the junks onto the wharf. The evidence does not satisfy me that such was the case, but, if 500 tons had been put upon junks, that would have enabled the steamer to go to her wharf and begin unloading, and then, if necessary, the iron on the junks could have been taken back after an equivalent amount had been taken out from the steamer. There is a provision in the charter party that any time lost in loading or discharging through various causes, and, among others, through any causes beyond the personal control of the charterers, is not to be computed as part of the lay days; and it is claimed that the charterers could not obtain lighters, and that, therefore, they were absolved from the obligation to obtain lighters. But I think that that provision does not nullify the other positive provision of the charter party that the charterers should provide lighters, if necessary, to enable the steamer to go alongside a safe dock. This was a voyage charter. The owner

was entitled to have the ship make the voyage and return promptly, and I think that the charterers by the charter in substance agreed to provide lighters, if necessary, to discharge the cargo at Dalny promptly, and agreed that, if that was not done, they would be liable for demurrage.

The charterers rely on a clause in the charter party that the vessel is to be discharged according to the custom of the port, and have called a witness who testified that it was the custom of the port at Dalny for steamers to discharge in turn. This witness had been at Dalny but once, and was hardly qualified to prove custom. But probably the alleged custom was nothing but the usual practice of harbor masters in all ports. A common sense of justice would lead any harbor master to send steamers to vacant berths in their turn. But I do not understand that the libelant complains that the Rutherglen was not admitted to a dock deep enough for her draft as soon as one was vacant. The complaint is that no lighters were provided so that, by taking off a part of her cargo, she could have gone at once to a shallower berth which was vacant.

[3] The charterers further rely upon the cesser clause in the charter, which provides: "Charterers' liability to cease on cargo being shipped, and freight paid." The Rutherglen Company claims that that clause does not apply because the lump sum freight was not paid in full, but, as in my opinion the charterers were justified in the deduction which they made, the just amount due for the lump sum freight was paid in full. The question recurs then whether the cesser clause applies, so as to free the charterers from their specific agreement to provide lighters, if necessary, at the port of discharge. The question is a nice one. Some authorities have undoubtedly gone very far in holding charterers exonerated by the cesser clause from all claims arising at the port of discharge. But I concur with Judge Hough in the case of Union Steamshipping Co. v. Gans Steamship Line,[1] that:

"If the charter party contains an agreement between the owner and the charterer which cannot be performed and cannot even be entered upon when the cargo is shipped or when bills of lading are signed at the loading ports, the charter must continue in existence until that portion of the contract relating to some other place and to a future time is completed."

If the provision in the charter party that the charterers are to provide lighters, if necessary, at the port of discharge is nullified by the cesser clause, there was no reason for inserting it in the charter party. It never had any validity. It died at birth.

In this case the Manchurian Railway was being constructed. Very large shipments of railroad iron and materials for the construction of the railway were being made deliverable at Dalny. It was apparently a port in which usually not a large business was done. There were but few docks there at which ships of large draft could lie. There was a probability of congestion there. It was entirely competent for the parties to stipulate which should be responsible in case of delay

[1] See note at end of case.

in unloading. By the charter the charterers agreed to provide lighters, if necessary. If it be assumed that it was not in their power to provide them, that fact, in my opinion, does not free them from liability. They made the contract, and I think that they were bound either to provide the lighters or to pay the demurrage. I think, therefore, that the Rutherglen Company is entitled to recover its claim for demurrage of $3,447.17.

[4] 3. The third claim is for an excess agency fee charged to the steamship by the agents designated by the charterers at Takow. The charter provided that the ·steamer was to be consigned to the charterers' agents at port·of loading and discharging "on usual terms say £10.10s at each port." When the Rutherglen reached Takow, .the charterers nominated Bain & Co. as their agents at Takow. Bain & Co. refused to act as such agents for the fee of £10.10, and demanded a fee of £25. The. master of the Rutherglen paid it under protest. In my opinion the charterers agreed that the agency fee should not exceed £10.10, and the owner of the Rutherglen is entitled to recover the excess paid over the amount agreed upon in the charter, being £14.10, or $70.56.

My conclusion, therefore, is that the Rutherglen Company should recover the sum of $3,447.17 for demurrage, and $70.56 for excess of agency fees, with interest and costs, and that a reference should be ordered to determine what amount, if any, should be deducted from the freight by reason of the claim set up in the cross-libel.

NOTE.—The memorandum of Hough, District Judge, in the case of Union Steamshipping Co. v. Gans Steamship Line, referred to in the opinion, is as follows:

"The exception to the sixteenth article of the answer seems to me well taken, in that the cesser clause is not a defense to this action.

"If the charter party contains an agreement between the owner and charterer which cannot be performed and cannot even be entered upon when the cargo is shipped or when bills of lading are signed at the loading port, the charter must continue in existence until that portion of the contract relating to some other place and to a future time is completed.

"This charter party does contain such a provision, namely, that the ship will be consigned to the charterer's agent at the port of destination, and that such charterer's agent shall (in effect) receive as and for his compensation no than £10.10.

"I remain of the opinion that this clause can be given no meaning whatever unless construed to be a warranty or guaranty on the part of the charterer that no more than the stipulated fee is exacted.

"It is no answer to this to say that the owner should not have paid more than £10.10, nor is it any answer to point out that the charterer's agent became the owner's agent by the act of consignment. These statements may be true, but there was an antecedent duty upon the charterer to see to it that the agent nominated by the charterer agreed to serve for the stipulated sum. Therefore the exception to the sixteenth article of the answer is sustained.

"But this does not go to the kernel of the controversy. The seventeenth and eighteenth articles of the answer (taken together) seem to me to clearly assert that the payments or exactions which are the subject-matter of this. suit were not paid to charterer's agents but to persons lawfully appointed in France and clothed with power of demanding and obtaining .these fees no matter whether they were or were not the ship's agents or whether or not.

they had the ship consigned to them. If this be not true, it is at least the construction of the answer most favorable to the pleader, and the court is bound to accept it.

"It could not have been the intention of the parties that, if A. B. at the port of Bordeaux was under French law entitled to collect a certain fee for entering the Marka at that port, such expense could be put upon C. D. by an agreement between the owner and charterer of the Karma to the effect that the steamer should be consigned to C. D., and he be paid for all his services a smaller sum than the statutory cost of entering. In other words, the ship's agent in America attends to the entry of a vessel consigned to him as a part of his agency duty. The answer in this case declares in effect that in France he cannot do it, but some official must do it, and must be paid for it at statutory rate.

"If this be true, the shipowners have in effect been taxed, and lawfully taxed, and it was beyond the power of either owner, charterer, or agent to avoid or diminish said tax. This is substantially the point as to which there was no proof in The Cape Breton arbitration, to which Mr. Woolsey refers. In this case there may be no proof when the trial comes on, but the pleading avers a defense which I think good.

"The exceptions to the seventeenth and eighteenth articles of the libel are overruled."